KANSAS CITY STOCK-YARDS COMPANY v. P. C. HAWKINS.

No. 394.

1. EVIDENCE *Insufficient.* The evidence in this case reviewed, and held not to justify a verdict for the plaintiff below.

2. MEASURE OF DAMAGES — *Negligence — Instructions.* It was not error to give to the jury an instruction, in substance, that if they found that the plaintiff had suffered damage through the negligence of the defendant, and by reason of such negligence the plaintiff's cattle could not reasonably be marketed on the day of their arrival in Kansas City, then the plaintiff had a right to hold over for the market of the succeeding day, and the measure of his damages would be the difference between their market value on the day of their arrival, if the negligence had not occurred, and their market value when they could be first reasonably be put on the market in the condition they were in, and in addition thereto the extra expense rendered necessary by such negligence, but in no event could he recover a greater amount than the loss he actually sustained.

3. ——— *Improper Allowance.* Where the plaintiff testified that he always fed his cattle before a sale, the item of feed on the day of their arrival should be excluded from any estimate of the damages to which he is entitled.

4. ——— *Excessive Verdict.* The evidence as to the actual loss sustained by the plaintiff examined, and found not to equal the amount of the verdict.

Error from Wyandotte district court; HENRY L. ALDEN, judge. Opinion filed December 15, 1898. Reversed.

*Waggener, Horton & Orr, Miller & Morris, and Pratt, Dana & Black*, for plaintiff in error.

*McGrew, Watson & Watson*, for defendant in error.

The opinion of the court was delivered by

WELLS, J. : On October .15, 1894, at about seven o'clock A. M., there was set into the Kansas City stock-yards a train of twenty-six cars of stock, one car of which was taken on at Parsons and has nothing to do with the controversy in this case. The first three cars contained seventy-four mixed cattle of inferior grade belonging to Hawkins, the defendant in error. The next nineteen cars held 476 steers of a better quality, belonging to Hawkins, and the three other cars held thirty head each, all of which were the culls belonging to the party of whom Hawkins bought the stock, except sixteen head of Hawkins's better grade which were shipped in a car filled up with culls.

Hawkins accompanied his cattle, and they were consigned to the commission firm of McDonald, Crowley & Farmer, at the Kansas City stock-yards. The culls belonging to the Dulls and the sixteen head of Hawkins's better grade of cattle were consigned to Godair, Harding & Co., of Chicago, with privilege of selling them in Kansas City. The first car unloaded was evidently the one containing the sixteen steers of the better grade belonging to Hawkins and fourteen of the culls, and these were penned separately. The next two cars unloaded were the remaining sixty culls, and were mixed, either with seventy-five of Hawkins's better-grade cattle, as claimed by the defendant, or with the 475, as claimed by the plaintiff. The seventy-four mixed cattle at the head of the train were kept separate, and were sold on the morning of arrival, so they are virtually eliminated from the case.

Stock-yards Co. v. Hawkins.

The plaintiff Hawkins claimed that the cattle were mixed through the negligence of the defendant company, and this action was brought to recover the damages resulting therefrom. The matter was tried to the court and a jury. The jury found a general verdict for the plaintiff, and assessed his damages at $1200, and judgment was rendered by the court accordingly. To reverse this judgment the case is brought to this court.

The first assignment of error is that the court refused at the close of the evidence to give an instruction to the jury, as asked for, to find a verdict for the defendant. This raises the question, Was there sufficient evidence on which to found a verdict for the plaintiff? In order to justify this verdict, it must appear from the evidence that the mixing of the cattle was caused by the negligence of the defendant. The undisputed evidence in the case establishes the following facts : Upon the arrival of the train at the stockyards it was met by J. B. Crowley, a representative of the firm to whom the cattle were consigned, who got upon the top of the car upon which the plaintiff was standing, as soon as the train stopped. Hawkins then told him he had twenty-two cars of cattle, nineteen loads of steers, and three loads of cows, bulls and stags mixed, and said : "You keep the three loads of cattle separate, but the other nineteen loads it does n't make any difference." After some further direction was given Crowley, Hawkins went to breakfast, and when he returned about an hour later the cattle were yarded.

In answer to the question, "Whom did you leave there in charge of it to see that the cattle were unloaded," Hawkins answered, "Well, I left Mr. Crowley there ; I did n't leave any one." Taking all the evidence on that subject together, there can be no

doubt that Crowley was authorized by Hawkins, aside from the fact that he represented the consignee of Hawkins's stock, to look after the unloading and penning of them in his absence, and whatever he said or did would have the same effect as if done by Hawkins in person.

The next question is, What caused the mixing of the cattle ?   R. H. Smith, foreman of the stock-yards, testified on this subject, in substance, that he ran the first car single, then turned the second car into the alley and was going to keep it separate, when Crowley came up and said : " Why, they are all our cattle, and why not let five car-loads go together ?"   Frank De-Hass then said : " If the man wants to run them all together, they are all his cattle ; why not run them to-gether in five-car bunches ?"  "Crowley said he wanted them run together, so we ran them that way."  Frank DeHass, foreman, testified on this subject, in substance, that he was assisting Smith in unloading and yarding this stock ; that they had yarded the first load separately, and, when the second load was started away to be run separately by Smith and himself, Crowley came up and said : " These are my cattle and we want them run together," and so they were run in five-car lots, but would have been kept separate but for Crowley ; and that under the rules commission men had control of the stock.   Timothy Flahive testified that Crowley told him they all belonged to him and would all go together.   The only other witness who testified on this subject was J. B. Crowley, who testified for the plaintiff in rebuttal as follows : " I came up there, and they started to lot out a chute, and I spoke up and said, ' That car number do n't correspond.'  R. H. Smith threw the gate to and said, ' What about it ?' I said, ' I will look,' and I looked at the cattle.   ' I

do n't know,' I said ; 'they look like the same kind of cattle.'  Frank DeHass then spoke up and said, 'They look like the same kind of cattle.   They are the same brand of cattle ; better run them together.'   I said 'Let them go,' and the cattle were run together.'' This was all the evidence upon that subject, and there is nothing therein that would justify the jury in finding that the cattle would have been mixed had it not been for the action of J. B. Crowley.   The peremptory instruction should have been given.

The next error complained of is in giving instruction No. 5, as follows :

''In arriving at the amount of damages, if any, sustained by the plaintiff by reason of the negligence of said defendant, as hereinbefore stated ( if you find it was so negligent), the jury may take into consideration all consequences proximately resulting from such negligence, and if you find from the evidence that plaintiff's said cattle or any part thereof were negligently mixed by said defendant, its agents, servants, and employees, with an inferior lot of cattle belonging to other persons, and that in attempting to separate such cattle from his, plaintiff's cattle, or such number thereof as you find were mixed with the cattle of others, became so heated and excited, without fault on the part of said plaintiff, that they would not take food or water, as they otherwise should have done, and were for such reason in an unmarketable and unsalable condition on said 15th day of October, 1894, or if, when such cattle could first be offered for sale, the market for that day was practically over, then the plaintiff had the right to hold such cattle over for the market for the succeeding day, and the cost of extra food, if any, the shrinkage, if any, occasioned by the attempt to separate such cattle, and the holding of them over, the decline in the market value thereof, if any, the deteriorating effect, if any, upon plaintiff's said cattle, by leaving such inferior cattle among them as it was impossible to separate there-

from, if you find there were any such, are all elements of damage to be considered by the jury in arriving at their verdict herein.   But in no event can the plaintiff recover a verdict for an amount greater than the difference between the market value of said cattle on the market at the Kansas City stock-yards on said October 15, 1894, had the defendant not been negligent in relation thereto, and what said plaintiff afterward received therefor when he did sell them, whether at Kansas City or elsewhere, less all necessary expenses for feed and cars and freight to another market made necessary by the negligent acts of said defendant.''

This tells the jury, in substance, that if they find for the plaintiff, and further find that by reason of said negligence the cattle could not reasonably be marketed on the 15th, then the plaintiff had a right to hold them over for the market of the 16th, and the measure of the plaintiff's damages would be the difference between their market value on the 15th, if the negligence had not occurred, and their market value when they could be first reasonably put on the market, in the condition they then were, in addition to the extra expense rendered necessary by such negligence; but in no event could he recover a greater amount than the damages he actually sustained. This is the correct measure of the damages, with the exception of extra food, for which no charge is made in the petition, except for that used on the 15th, when plaintiff admitted they would have had to be fed anyway.

The next assignment of error is in refusing to give instructions 4, 5, 8, 9, and 10, as asked by defendant. No. 4 was properly refused, as it excluded proper elements of damage.   No. 5 should have been given, as the plaintiff testified that he always fed before selling,

and feeding on the 15th would have been an item of expense if the cattle had not been mixed. No. 8 should have been given, as the freight to St. Louis was not an element of damage and should only have been considered in arriving at the amount of loss actually sustained. The ninth and tenth instructions do not give the law correctly, as applied to this case, and these were properly refused.

The fourth assignment of error is that the verdict was excessive. We find from the record that is before us that this is true. Four hundred and ninety-one head of cattle, weighing 900 pounds each, at $2.40 per 100 pounds, would amount to $10,605.60; this is the largest amount with which defendant could be charged. As to what the cattle actually brought in St. Louis, there is no concise statement in the record. An account of sales was identified and referred to, but the substance of it is not given and no copy appears. The evidence shows that the cattle averaged in St. Louis 865 pounds each, and sold for $2.35 per 100 pounds; this would amount to $9,980.80. Deduct from this $387.70, the admitted expense to St. Louis, and $32.63, one-half the feed bill in Kansas City, (and these are the only items of expense for which we can find any evidence,) this would leave the net proceeds of the cattle $9,560.47. From these figures it would appear that the largest amount for which a judgment could be given under the evidence is $1045.13. We are clearly of the opinion that the trial court erred.

The judgment of the court below will be reversed and a new trial awarded.

McElroy, J, concurring.

Mahan, P. J. ( dissenting ) : I cannot agree to the first and fourth conclusions of the majority of the

court embodied in the syllabus.    I am fully convinced that there is evidence of negligence to go to the jury in support of the plaintiff's claim, and that the verdict of the jury is not in excess of the damages proved.